## In re INITIATIVE PETITION NO. 142, STATE QUESTION NO. 205.

No. 26718.   Sept. 13, 1938.

V. E. McInnis and Rainey, Flynn, Green, & Anderson, for protestant.

Herschel V. Lewis, Shirk, Danner & Earnhart, Snyder & Lybrand, S. J. Berton, and R. O. Wilson, for proponent.

Charles West, for interveners Tom Cheek and Ira Finley.

BAYLESS, V. C. J. This involves an appeal from a finding of the Secretary of State that Initiative Petition No. 142 was insufficient. We have heretofore written an opinion in this matter, which disposed of certain issues of law, and retained jurisdiction of the matter for the purpose of taking evidence to settle the issues of fact arising under the rules of law announced. In re Initiative Petition No. 142, State Question No. 205, 176 Okla. 155, 55 P.2d 455. The matter was thereupon referred to the referees of the court for the purpose of taking the testimony. They have completed their task, and have reported to the court. The parties have briefed the matter, and we now proceed with the consideration of the contentions of the parties as disclosed by their briefs.

The burden was upon the protestant in the hearing before the Secretary of State,

and since the trial here is de novo, the burden yet rests with the protestant. In our consideration of this matter we have adopted the propositions, and the order of discussion, found in the brief of the protestant.

The first proposition reads:

"Where circulators of initiative petitions are paid at the rate of so much per name secured on such petition, and their compensation is contingent upon the success of their endeavor to secure such names, signatures so procured are invalid and such petitions must fall."

This proposition is argued in two parts. It is first insisted that the fact that the circulators were to be paid 2½ cents per signature obtained constitutes a scheme designed to pay depending upon the success of the venture. It is argued that such an inducement to succeed is to be condemned because of fraudulent practices which are encouraged thereby. It is admitted that an agreement to pay circulators is valid. In re Initiative Petition No. 23, State Question No. 38, 35 Okla. 49, 127 P. 862, and In re State Question No. 138, Initiative Petition No. 89, 114 Okla. 285, 244 P. 801. The argument is that, while these decisions announced a rule of law which permits the payment of circulators for their services, such payment must not depend upon "the success of the enterprise." The parties spar with each other over what is meant by this phrase. Obviously, since a circulator working for pay would be paid only for each signature he obtained, the phrase ought not have this narrow application. There is no charge, or showing, that the receipt of payment by the circulators was to depend upon the final result of all of the circulators in producing the required number of signatures, nor was their compensation to depend upon the eventual submission of the petition to the suffrage of the people, or its adoption by the people. The only element of success was the total number of signatures obtained by the particular circulator.

In the briefs general charges of wholesale fraud and illegality of results are made, as well as of charges of nonresident interests furnishing the money to finance the initiated measure. No effort is made to be specific, nor to bear out these charges under this head.

For the reason above stated, we are not impresssed with the merit of the first proposition.

Propositions 2, 3, and 4 involve specific charges of fraud, such as misrepresentation by the circulators to the signers of the contents and purposes of the petition and the proposed measure; and, that certain persons were solicited to sign irrespective of their citizenship. No citations of facts or reference to evidence in the record on either of these points is made, but reference is made to the applicability of argument under other propositions touching the alleged invalidity of signatures appearing upon the pamphlet. For this reason we pay no further attention to these specific propositions.

Propositions 5, 6, 7, 8, 9, 10, and 11 may be combined in the consideration of the various points raised, since all go to different questions concerning the validity of certain signatures appearing on the pamphlets. We will divide the attacked signatures into four general classes, to wit: Nonregistered signers; forged signatures and unreliable certificates of circulators made with knowledge of such forgeries; double signing and other improper signatures, and unreliable certificates of circulators made with the knowledge of such improprieties; and admittedly invalid signatures.

Before beginning a discussion of these aspects of the case it might be proper to say that it is agreed that it is necessary for the petition to contain 94,250 valid signatures; and it is admitted that the pamphlets filed contain 109,385 signatures. Therefore, for the protestants to be successful, it is necessary that 15,136 names be successfully challenged and stricken from the pamphlets filed.

The protestant contended that 17,648 of the signatures appearing upon pamphlets circulated in Oklahoma county should be eliminated, on the ground that this number of said signatures were of nonregistered persons. To support this contention the protestant undertook to establish that the names of the persons whose signatures were thus challenged were not of entry in the Oklahoma county registration book. Said book was introduced in evidence, but showed on its face that it was not complete. In section 5657, O. S. 1931 (26 Okla. St. Ann., sec. 77), it is provided:

"Each precinct registrar shall, within ten days after the 30th day of June, 1916, and within ten days after any other registration, deliver to the secretary of the county election board the duplicate registration certificates which have been issued by him in his precinct. * * * The secretary of the county election board shall. within 20 days after the receipt of the duplicate certificates of registration, from the precinct registrars

in his county, make up a county registration book; such county registration book shall be substantially bound and shall be a permanent record. The secretary of the county election board shall enter in such county registration book, in alphabetical order and by election precincts, the name of each elector registered, the school district in which such elector resides, the date of his registration, his age, residence, occupation, race, color, politics, and the number of registration certificate as shown by the duplicate registration certificate of each precinct. Such county registration book, when completed by the secretary of the county election board, shall be filed by him with the county clerk of the county, and the same shall be a public record, and the county clerk shall be custodian thereof."

And in section 5659, Id. (26 Okla. St. Ann. sec. 79), it is provided:

"After the close of registration ten days before any election as herein provided, and after the close of the registration of electors on June 30, 1916, or after the close of any other supplemental registration, the precinct registrar shall immediately after the closing of such registration, * * * deliver to the secretary of the county election board the duplicate registration certificates so issued in the same manner as hereinbefore provided, and the secretary of the county election board shall receive such certificates, receipt for the same, and add the names of such electors in the county registration book in the same manner as hereinbefore provided. The permanent record of registrations made by the secretary of the county election board and filed with the county clerk shall be certified by the secretary of the county election board to be true and correct and when filed in the office of the county clerk shall be open to inspection by any person. * * *"

The certificates of the secretary of the Oklahoma county election board appearing in said book were only in relation to registrations which had been made between some unstated day and month in the year 1930 and December 17, 1935. And said book contained no entries in relation to registrations which had been made in Oklahoma county beginning with the time when the general registration law became effective (February 26, 1916) and up to the aforementioned period in 1930. Hence, in the state of the record, we are unable to ascertain and determine that signers of the pamphlets circulated in Oklahoma county whose names are not entered in the registration book of that county are nonregistered persons. It follows, therefore, that we must hold the evidence on the part of the protestant to be insufficient to overcome the presumption

that any of the 17,648 signatures challenged were names of registered persons.

Upon a similar ground and in a like manner the protestant also attacked 9,542 of the signatures appearing upon pamphlets circulated in Tulsa county, and 1,079 of the signatures appearing upon pamphlets circulated in Muskogee county. Such proof, however, as was made on the part of the protestant in support of the attack did not establish that the registration books of said counties reflected registrations of electors from the time the general registration law became effective, or that said books contained the series of supporting certificates prescribed by the aforementioned statutory provisions to be made by the county election board secretaries. But, assuming the registration books of said counties to be full and complete in all respects prescribed by said statutory provisions, yet the total of the signatures involved in this particular attack is not sufficient, standing alone, to invalidate the initiative petition as a whole. We hold the proof on the part of the protestant to be insufficient to sustain said attack.

We now take up the questions of forgeries and certificates made by the circulators with knowledge of such forgeries.

Protestant used as a witness a man who qualified as a handwriting expert. This witness examined the pamphlets containing the signatures. He examined those of some ten circulators, and condemned these pamphlets, containing upwards of 30,000 signatures, as having among such signatures many forgeries. The forgeries pointed out by him amounted to several thousand. As to some of these circulators, the referees declined to follow this opinion evidence, and admitted all of the pamphlets circulated by certain of the circulators. In other instances, they believed the evidence of this expert and eliminated upwards of 20,000 names. This in itself is sufficient to defeat the petition if we follow the recommendation of the referees. Upon consideration of all of this testimony, we are unable to accept their recommendation striking these names. We are unable to differentiate between the quantity or quality of this evidence as between these circulators. In one instance, this witness testified that, when he testified before the Secretary of State, he had condemned every signature appearing on all the pamphlets of one circulator as being forged by that circulator, and yet, in testifying before the referees, he voluntarily

receded from this position and selected certain signatures only. 'This in itself is sufficient to shake, somewhat, the faith which could be placed in his opinion on this matter. In addition to this, as to nearly every circulator whose pamphlets he attacked as containing forgeries, the proponents were able to bring in signers, whose signatures had been attacked as forged, who testified before the referees and identified, and authenticated, their signatures as having been written by themselves.

In the instance of one circulator, the witness pointed out 495 alleged forgeries, and testified in great detail as to why, in his opinion, these were forgeries by the circulator herself. This particular circulator worked in and around Tulsa and the proponents were able to bring in 70 odd of these people who readily testified that they had signed their signatures to the particular pamphlets. The detail with which he identified in these signatures characteristics of the handwriting of the circulator commanded credence. But in the face of so many positive proofs to the contrary, the value of his opinion is weakened. It is not necessary to cite all of the facts as to all of these circulators, nor the extent to which this expert witness' opinions were successfully overcome. It is sufficient to say that the proponents have succeeded in convincing us that his conclusions were erroneous. See In re Referendum Petition No. 71, 179 Okla. 381, 65 P.2d 985.

It seems that the referees, believing that these pamphlets contained these numerous forgeries, and believing that the circulators must have known they were forgeries, were of the opinion that the affidavits of circulators were unworthy of belief, and they so found. Since we are of the opinion that this witness' evidence furnished no basis for such finding, we must admit in evidence these signatures excluded by the referees.

We now come to the consideration of that group of pamphlets containing illegal signatures by reason of double signing, etc. This involves some 21,180 names, and if sustained to that extent, defeats the petition. The evidence shows, and the referees found, that on certain pamphlets there appeared 2,234 signatures which were improper and illegal because of the fact that husband had signed for wife, or vice versa, or there appeared signatures involving irregularities. The referees, after pointing out these signatures, were of the opinion that, since the circulators knew that these people did not appear before them, or that the persons signing had not complied with the law in so doing, the circulators' certificates on the pamphlets were unworthy of belief. The referees made alternative recommendations: That 2,234 names be stricken as illegal, or that all pamphlets containing such illegal signatures be stricken—21,180 signatures in all. The evidence upon which the referees condemned the specific signatures consists of the testimony of the discredited expert and some 15 witnesses who denounced their purported signatures. In the instance of some names efforts to palliate the wrongful signing were made by testimony of supposed authority. Even if this is accepted as sufficient to sustain the protest as to the particular signatures, we are doubtful whether it is sufficient to establish evil intent or guilty knowledge to the circulator. This evil arises by inference as to all except not to exceed three circulators.

It is true that these pamphlets must contain the affidavit of the circulator tending to establish certain facts, and among them that the persons whose names appeared thereon signed the pamphlets in their presence. It is, likewise, true that a husband, or wife, cannot sign for the other in the absence of the other. The names of persons unable to write ought not to be written except in compliance with our statute. But it seems to us that this rule of law is announced to define illegal signing and it ought not be the means of eliminating thousands of signatures of well meaning people who are desirous of initiating the legislation and whose signatures and conduct are above reproach. The certificate of the circulator is an important factor, but ought not be given a preponderance not justified by the purposes of the law. It seems to us that the rule which ought to be adopted is this. that names shown to be improper, or illegal, should be stricken from the list and the names against which no attack is leveled should be permitted to remain, and to have their legal effect. It is only where the misconduct of the circulator is such as to cast doubt upon the work of the circulator as a whole, or where shown illegal phrases or illegal names cannot be singled out and eliminated, that entire pamphlets or all of the pamphlets of a particular circulator ought to be rejected. In other words, courts are triers of fact, and when the facts can be made satisfactorily to appear from which definite conclusions reasonably can be reached, then the court

will make findings in accordance with such facts and will not close its eyes to the true situations and reject everything on the theory contended for by protestants. This discussion of this subject in State v. Olcott, 62 Ore. 277, 125 P. 303, is wholesome, and applies here.

Propositions 12, 13, 14, and 15 contain attacks upon certain pamphlets of certain circulators, but upon consideration of these they do not involve sufficient names to sustain the protest, and, in some instances, are disposed of by earlier opinions of this court, and it will serve no useful purpose to discuss them in this opinion. The referees made no recommendations as to them, and in the briefs before us such attacks are stated more in the nature of conclusions, and in some instances involve matters already discussed under other heads.

It appears from the evidence in the record that there are 4,907 names on these pamphlets which must be eliminated for various reasons. In the course of the argument of the proponents it was admitted, for the sake of the argument, that certain names might be eliminated and these mount up to about 10,000 names. However, there is included in this number the 4,907 heretofore mentioned, and since it was necessary for the protestants to successfully attack over 15,000 names, it is obvious that these numbers are not sufficient to sustain the attack.

As heretofore noted in the discussion of the specific grounds of attack, there were 28,269 names involved in the alleged non-registrations; 21,497 involved because of certain unreliable certificates involving forgeries; and 22,180 involved for certain unreliable certificates because of double signatures. These figures should not be added together in arriving at the total of names attacked, because an examination of record discloses that these overlap in thousands of instances. Since we have not sustained these attacks in their total numbers, but have eliminated those which are shown, or admitted to be illegal, these larger totals should not be taken as indicating that upwards of 70,000 of the 109,000 submitted were actually attacked. To do so would be to permit the inference that the general course of conduct of the circulators was questionable to an alarming extent. The overlapping accounts for much of the size of the total. The signatures singled out did not exceed 10,000, and of the 4,907 actually eliminated, a large portion involve technical clerical irregularities entirely free of bad intent.

Proposition 16 complains of the failure of the proponents to file a copy of the petition with the Attorney General. Our opinion in Re Petition No. 2, 157 Okla. 61, 10 P.2d 271, disposes of this.

Initiative petition held sufficient.

OSBORN, C. J., and RILEY. WELCH. PHELPS, CORN, and HURST, JJ., concur. GIBSON, J., dissents. DAVISON, J., absent.